UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

WENDY CASTRO, M.C., a minor, by
and through his mother and natural
guardian

       Plaintiff,

v.                                              Case No:  2:15-cv-378-FtM-38CM

UNITED STATES OF AMERICA,

       Defendant.
_____/

## **ORDER**[1]

This matter comes before the Court on Plaintiff M.C.'s motion to preclude the United States of America's experts from testifying that the natural forces of labor, and not the midwife, caused his birth injury. (Doc. #21). The Government has responded in opposition to Plaintiff's motion and filed its own cross motion to preclude Plaintiff's experts from testifying that the natural forces of labor could not have caused the injury. (Doc. #28). Unsurprisingly, Plaintiff opposes the Government's motion. (Doc. #32). On September 15, 2016, the Court held a hearing on the motions. For the reasons set forth below, the Court denies Plaintiff's motion but grants the Government's motion.

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

## BACKGROUND

This medical malpractice case centers on Plaintiff's birth injury. Around three years ago, Wendy Castro gave birth to Plaintiff at Gulf Coast Medical Center. Barbara Carroll, a certified nurse midwife ("CNM Carroll"), delivered him. Complications arose during the delivery – specifically, shoulder dystocia.

Shoulder dystocia occurs when a baby's shoulder is stuck behind either the mother's pubis symphysis or sacral promontory. When the shoulder is stuck behind the pubis symphysis, *i.e.*, a fixed joint where the two pubic bones meet, the condition is called *anterior* shoulder dystocia. (Doc. #28-2). When the baby's shoulder is obstructed by the sacral promontory, which is part of the mother's tailbone, the condition is called *posterior* shoulder dystocia. Because the pubis symphysis is further along the birth canal, an anterior shoulder dystocia occurs after a baby's head crowns. Plaintiff suffered a posterior shoulder dystocia, which is less common. (*Id.* at 2; Doc. #28-17 at 2).

Upon delivery, Plaintiff showed no movement of his left arm, decreased movement of his right arm, facial bruising, and overriding sutures. He was diagnosed with a brachial plexus injury, a known complication of shoulder dystocia. The brachial plexus is the network of nerves that run from the spinal cord to the shoulder and arm, and these nerves can stretch or tear while a baby's shoulder is caught behind his mother's anatomy.

Because Plaintiff's brachial plexus injury is permanent, he brings this suit against the federal government who funded the health center that employed CNM Carroll.[2] Plaintiff alleges, among other things, that CNM Carroll used excessive traction, *i.e.*, pulling on his head and neck, after she encountered the shoulder dystocia, and that her

---

[2] The Government concedes that it is the proper defendant in this suit, which Plaintiff brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680. (Doc. #28 at 5 n.2).

negligent care caused his injury. To support his position, Plaintiff relies on the expert opinions of Dr. Michael Kreitzer, an obstetrician, and Jody Perez, a certified nurse midwife ("CNM Perez").

The Government contests these claims. It argues that the natural forces of labor, *i.e.*, the forces associated with contractions and pushing, and not CNM Carroll applying excessive traction, caused Plaintiff's brachial plexus injury. To support its defense, the Government relies on the expert opinions of Dr. Robert Gherman, a board certified physician in maternal/fetal medicine and obstetrics/gynecology, and Carolyn Gegor, a certified nurse midwife ("CNM Gegor"). Pending now is each party's motion to preclude the opinions and testimonies of the opposing experts.

## I. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony bears the burden of proving by a preponderance of evidence that the opinions are reliable. See *Kilpatrick v. Breg Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010).

3

Applying these principles, district courts may admit expert testimony if three requirements are met: (1) the witness is qualified to testify competently about the matter he or she intends to address; (2) the witness employs a reliable methodology per a *Daubert* inquiry; and (3) the testimony must assist the trier of fact to understand the evidence or determine a fact in issue. *See id.* Here, both party's motions hinge on whether the methodologies used by the experts are reliable under *Daubert*.[3]

In deciding whether expert testimony is admissible, the Supreme Court has tasked district courts to act as "gatekeepers" in order to ensure that only reliable and relevant expert testimony reaches the jury. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999) ("We conclude that *Daubert's* general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The Supreme Court also articulated a non-exclusive list of factors to consider:

- whether the expert's theory can be or has been tested;
- whether the theory has been subject to peer review and publication;
- the known or potential rate of error of the theory when applied; and
- whether the theory has been generally accepted in the scientific community.

*Daubert*, 509 U.S. 593-94; *see also Kilpatrick*, 613 F.3d at 1335 (citations omitted). Because a court's "gatekeeping inquiry must be tied to the facts of a particular case,"

---

[3] Neither party challenges the qualifications of the other party's experts. Thus, the Court need not detail nor review each expert's credentials and experience in the medical field.

*Kumho*, 526 U.S. at 150, it may consider other factors in deciding whether expert testimony is reliable, including:

- whether the experts have developed their opinions expressly for purposes of testifying;

- whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; and

- whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.

Fed R. Evid. 702, Advisory Committee Note (2000 Amendment). At bottom, the court must do "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593-94.

With these standards in mind, the Court turns to the parties' respective *Daubert* motions.

## DISCUSSION

To recap, the parties agree that CNM Carroll encountered a posterior shoulder dystocia during Plaintiff's delivery, meaning that his shoulder was stuck behind his mother's tailbone before his head crowned. They also agree that Plaintiff has suffered a permanent brachial plexus injury. They square off as to whether the natural forces of labor or CNM Carroll's delivery techniques caused Plaintiff's injury. This is a quintessential battle of the experts.

**A. Expert Opinions**

Before turning to the merits of the *Daubert* motions, the Court will review the expert opinions, starting with Plaintiff's side.

*1. Dr. Kreitzer and CNM Perez*

Both Dr. Kreitzer and CNM Perez opine that CNM Carroll deviated from the standard of care because she used excessive traction after she encountered the shoulder dystocia. They reach this conclusion based on the severity and permanency of Plaintiff's brachial injury. (Doc. #28-5 at 80:11-81:17; Doc. #28-11 at 138:4-12).

While CNM Perez's opinion stops there, Dr. Kreitzer goes one-step further. It is Dr. Kreitzer's opinion that Plaintiff's brachial injury occurred because CNM Carroll used upward traction to dislodge his shoulder. (Doc. #28-11 at 142:23-143:19). According to him, CNM Carroll used upward traction because she attempted to deliver Plaintiff's posterior shoulder and she admitted to never taking her hands off his head after encountering the shoulder dystocia. (*Id.* at 138:4-11, 143:8-23; Doc. #28-4 at 56:5-25). From there, Dr. Kreitzer states that upward traction is the only explanation for the overstretching of Plaintiff's posterior arm, and that "[i]t is pure speculation and theory to say that shoulder dystocia by itself can cause this injury, when tests and prospective studies demonstrate it does not." (Doc. #28-11 at 138:25-139:7, 143:20-23). Thus, Dr. Kreitzer believes only one conclusion can be drawn in this case – excessive traction by CNM Carroll caused Plaintiff's brachial plexus injury.

*2. Dr. Gherman and CNM Gegor*

Dr. Gherman and CNM Gegor stand in direct contrast to Dr. Kreitzer and CNM Perez. Neither Dr. Gherman nor CNM Gegor agrees that the mere presence of Plaintiff's permanent brachial plexus injury means that CNM Carroll applied excessive traction. (Doc. #28-7 at 4; Doc. #28-9 at 6).

Starting with Dr. Gherman, he is of the opinion that the posterior shoulder dystocia itself caused Plaintiff's injury, and not CNM Carroll using excessive traction while managing the dystocia. (Doc. #28-7 at 4-5). Dr. Gherman relies on medical literature from the American College of Obstetricians and Gynecologists ("ACOG") and the Royal College of Obstetricians & Gynaecologists that discusses the differences between posterior and anterior shoulder dystocia. (*Id.* at 5). For posterior shoulder dystocia, like that here, the literature indicates, "it is not possible for the clinician to apply extraction forces that are often put forth as the cause of the injury because the head has not delivered." (*Id.*). In contrast to Plaintiff's experts, Dr. Gherman also avers, "an expert witness cannot conclude anything about the amount of traction that was applied during the delivery/shoulder dystocia by using the basis of a permanent peripheral nerve injury." (*Id.* at 4).

Like Dr. Gherman, CNM Gegor finds it important that Plaintiff suffered a posterior shoulder dystocia. (Doc. #28-9). She describes that condition as a "rare event" and "not a situation where the clinician's actions would cause damage to the brachial plexus; instead, the damage is part of a process occurring in utero, out of control of the provider." (*Id.* at 6). Thus, CNM Gegor finds no fault in CNM Carroll's delivery of Plaintiff.

**B. Plaintiff's *Daubert* Motion**

Again, Plaintiff moves to preclude Dr. Gherman and CNM Gegor from testifying that the natural forces of labor caused Plaintiff's permanent brachial plexus injury and that his injury could have occurred even in the absence of CNM Carroll applying traction. (Doc. #21 at 2). Plaintiff maintains that the natural forces of labor theory is novel and unscientific because it finds no support in medical methodology, texts, or literature. (*Id.*).

Plaintiff also argues that the Government's experts fail to distinguish between temporary and permanent brachial plexus injuries.

The Government, however, maintains that Plaintiff is presenting nothing more than a *res ipsa loquitur* theory of liability – namely, because Plaintiff suffered a permanent brachial plexus injury, CNM Carroll must have acted negligently. (Doc. #28 at 2). The Government recognizes that Florida law permits a *res ipsa loquitur* theory of negligence when there is no other explanation of the injury, but it argues that this is not such a case. Enter Dr. Gherman and CNM Gegor. The Government in essence counterattacks Plaintiff's theory of the case with Dr. Gherman's and CNM Gegor's opinions that the posterior shoulder dystocia coupled with the natural forces of labor caused Plaintiff's injury. With another explanation of Plaintiff's injury, the Government deflates Plaintiff's *res ipsa loquitur* theory, or so it argues.

At this stage, the Court's focus is not on the correctness or merits of Dr. Gherman's and CNM Gegor's opinions. That issue is for the bench trial. Instead, the Court need only decide whether their opinions are based on reliable methodology and principles. *See Daubert*, 509 U.S. at 595 (stating the "focus, of course, must be solely on principles and method, not on the conclusions they generate"). They are. The Government has submitted upwards of five peer-reviewed and published articles and textbook excerpts. Among other things, this medical literature backs the opinion that, because Plaintiff's injury occurred to his posterior, rather than anterior, shoulder, CNM Carroll's actions are not likely the cause of the injury. (Doc. #28-1 at 22, 27, 33-34, 36; Doc. #28-10 at 3; Doc. #28-13 at 4; Doc. #28-14 at 3; Doc. #28-15 at 4; Doc. #28-17 at 2). Particularly persuasive

is the ACOG compendium titled "Neonatal Brachial Plexus Palsy," published in 2014.

(Doc. #28-1).  The stated purpose of the ACOG compendium was

> [t]o review and summarize the current state of the scientific knowledge, as set forth in the peer-reviewed and relevant historical literature, about the mechanisms which may result in neonatal brachial plexus palsy.  The purpose of conducting such review is to produce a report which will succinctly summarize the relevant research on the pathophysiology of neonatal brachial plexus palsy.  Although primarily intended to inform the College's Fellows about the existing state of knowledge as to the etiology, as well the prediction, management, and treatment of neonatal brachial plexus palsy, this report also is meant to serve as a resource for all health care providers involved in this subject matter area.

After completing this review, the ACOG found, among other things, that

- "Stretch in the brachial plexus occurs during the birth process itself, as shown by both computer and physical models (1, 2), and it can occur in the nerves of either or both anterior and posterior shoulders.  This stretch results from differential motion between the fetal head and shoulders after some element of the maternal antimony halts or retards the progression of the larger shoulders through the birth canal (1, 3)."  (*Id.* at 22);

- "During a posterior shoulder impaction at the level of the sacral promontory, it is not possible for the clinician to apply extraction forces that are often put forth as the cause of the injury because the head has not delivered. The high rate of posterior shoulder involvement in deliveries that do not involve shoulder dystocia indicates that severe and persistent injuries may occur to the brachial plexus without the clinician's application of traction during delivery (13)."  (*Id.* at 27);

- "There is some evidence that the cardinal movements of labor alone may cause stretch in the brachial plexus (2), but the extent of this stretch requires more investigation.  Thus, the clinical and biomedical engineering evidence supports the assertion that when a shoulder is restrained either transiently or during a more significant impaction, both maternal forces and clinician forces, if applied, will stretch the brachial plexus."  (*Id.* at 33-34);

- "In addition to research within the obstetric community, the pediatric, orthopedic, and neurologic literature now stress that the existence of [neonatal brachial plexus palsy] following birth does not a priori indicate that exogenous [clinician] forces are the cause of this injury.  The pediatric neurologic community also has reviewed the literature on causation and has similarly concluded that, 'The obstetrician's efforts to relieve shoulder dystocia are not the whole explanation for brachial plexus birth injuries.

9

- Expulsive forces (ie, endogenous forces) generated by the uterus and the abdominal wall . . . may be contributory in many cases' (57)" (*Id.* at 36); and

- "Neither high-quality nor consistent data exist to suggest that NBPP can be caused only by a specific amount of applied force beyond that typically used by health care providers and experienced during a delivery without NBPP." (*Id.*).

In addition, the Government cites to a 1997 article in a medical textbook that supports the proposition that maternal forces of labor can cause permanent, as opposed to temporary, brachial plexus injuries. (Doc. #28-14 (stating "[i]n the cases with permanent Erb palsy in the posterior shoulder of the delivering infant, we hypothesize that the injury was not a product of traction applied at delivery but rather preceded expulsion of the fetal head"). This article, as well as the ACOG compendium, was peer reviewed and published, and thus signals reliability. *See Daubert*, 509 U.S. at 593-94.

Although not binding, case law from other jurisdictions supports the conclusion that Dr. Gherman's and CNM Gegor's natural forces of labor theory is reliable under *Daubert*. *See Silong v. United States*, No. CV F 06-0474, LJO DLB, 2007 WL 2535126, at *3-4 (E.D. Cal. Aug. 31, 2007) (denying plaintiffs' motion to exclude expert testimony regarding the maternal forces theory in a case involving a brachial plexus injury); *Potter v. Bowman*, No. 05-cv-00827-REB-PAC, 2006 WL 3760267, at *3 (D. Col. Dec. 18, 2006) ("[A]lthough plaintiffs couch their objections in the language of *Daubert* and its progeny, their complaint boils down to an argument that . . . [the] defense experts' opinions should be excluded because they are 'novel,' that is, that they are not generally accepted in the field of obstetrics. This standard, commonly known as the *Frye* test *. . .* although

potentially relevant to the calculus, is no longer the sole touchstone of admissibility under Fed. R. Evid. 702."); *Estate of Ford v. Eicher*, 250 P.3d 262 (Colo. 2011) (concluding that the trial court erred in excluding the opinions of the defense experts that the child's permanent brachial plexus injury was caused by maternal forces); *Bayer ex rel. Petrucelli v. Dobbins*, 371 Wis. 2d 428 (Ct. App. 2016) (concluding that the trial court erroneously excluded the defense experts' testimony that maternal forces of labor caused the baby's permanent brachial plexus injury).

Finally, Plaintiff's arguments affect the weight of Dr. Gherman's and CNM Gegor's opinions, not admissibility. Plaintiff may fully examine the issues raised in his motion on cross-examination or by presenting competing evidence. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (citation omitted)). "These conventional devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." *Id.*

In conclusion, the Government has met its burden of proving that Dr. Gherman's and CNM Gegor's expert opinions satisfy the requirements of Rule 702 and *Daubert*, and are thus admissible. Accordingly, the Court denies Plaintiff's *Daubert* motion (Doc. #21).

11

**C. The Government's *Daubert* Motion**

The Government cross-moves to preclude Plaintiff's experts, Dr. Kreitzer and CNM Perez, from testifying that permanent brachial plexus injuries cannot be caused by the natural forces of labor and that those injuries must result from the clinician applying excessive traction to a baby's head and neck during delivery. (Doc. #28 at 18-21). Simply, the Government does not want Plaintiff's experts testifying that the natural forces of labor are not a possible cause for Plaintiff's injury, as that would be contrary to the current peer-reviewed medical literature on posterior shoulder dystocia.

The Government draws the Court's attention to *Lawrey v. Good Samaritan Hosp.*, 751 F.3d 947 (8th Cir. 2014), a similar medical negligence case involving shoulder dystocia and a permanent brachial plexus injury. In *Lawrey*, the trial court precluded plaintiff's experts

> from offering any opinion that maternal expulsive forces *cannot* cause permanent brachial plexus injuries, or that birth-related brachial plexus injuries are *always* the result of traction applied to an infant's head and neck by the birth-attendant, or that the injury to [the plaintiff] was caused by [the physician] applying excessive traction to [the plaintiff's] head and neck.

*Lawrey v. Kearney Clinic, P.C.*, No. 8:11-cv-63, 2012 WL 3583164, at *4 (D. Neb. Aug. 20, 2012) (emphasis in original). The Eighth Circuit affirmed. It found that the opinions of plaintiff's experts did not fit the facts of that cause because, in part, the "[plaintiff's] injury resulted from a posterior shoulder dystocia, which, as previously noted, occurs before a baby's head has crowned. This means the force which could cause [the plaintiff's] injury must have been applied while her head and neck were still in the birth canal." *Lawrey*, 751 F.3d at 953.

The Court finds *Lawrey* to be instructive.  All credible evidence before this Court suggests that brachial plexus injuries can and do occur in a fixed percentage of births where the clinician applies no traction.  And the fact that this case involves a posterior shoulder dystocia cuts against the relevancy of Plaintiff's experts testifying that because he suffered a permanent brachial plexus injury, CNM Carroll acted negligently.  The Court, therefore, grants the Government's motion thereby precluding Plaintiff's experts from testifying that the natural forces of labor is not a possible cause for Plaintiff's injury.

Accordingly, it is now

**ORDERED:**

(1) Plaintiff Initial *Daubert* Motion to Preclude Defendant's Experts from Testifying that the Plaintiff's Permanent Brachial Plexus Injury Was Caused by "Maternal Expulsive Forces" (Doc. #21) is **DENIED**.

(2) The United States of America's Cross Motion to Preclude Plaintiff's Experts from Testifying that Permanent Brachial Plexus Injuries Cannot be Caused by the Natural Forces of Labor (Doc. #28) is **GRANTED** as set forth herein.

**DONE** and **ORDERED** in Fort Myers, Florida this 13th day of October, 2016.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record

13